UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| FRANK A. DILORENZO | : |
| | : |
| Plaintiffs, | : |
| | : |
| V. | : |
| | : CIVIL ACTION NO. 3:03 CV 00183 (AWT) |
| METRO-NORTH RAILROAD COMPANY, | : |
| CONSOLIDATED RAIL CORPORATION | : |
| AND AMERICAN FINANCIAL GROUP | : |
| INC., f/k/a AMERICAN PREMIER | : |
| UNDERWRITERS, INC., f/k/a | : JULY 31, 2006 |
| PENN CENTRAL CORPORATION | : |
| | : |
| Defendants. | : |

**DEFENDANT METRO-NORTH RAILROAD COMPANY'S
MEMORANDUM OF LAW IN SUPPORT
OF MOTION TO PRECLUDE PLAINTIFF'S EXPERT,
DR. J. CAMERON KIRCHNER**

The undersigned Defendant, Metro-North Railroad Company (hereinafter "Metro-North"), pursuant to Federal Rules of Evidence 104 and 702, hereby moves to preclude the proffered testimony of the plaintiff's purported expert, Dr. J. Cameron Kirchner.

As will be discussed below, Dr. Kirchner failed to follow any rigorous or accepted methodology in forming his opinions. Dr. Kirchner is an ear, nose, and throat physician who, based solely upon one examination, opined that the plaintiff's alleged hearing loss and tinnitus were caused

by his exposure to noise at Metro-North.[1] Discovery shows that Dr. Kirchner employed no scientifically valid methodology in reaching his opinion.

Because Dr. Kirchner's opinion that the plaintiff's alleged hearing loss was caused by his exposure to noise at Metro-North is not based on reliable scientific methods, this opinion is unreliable and inadmissible under Federal Rule of Evidence 702; Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786 (1993); and Joiner v. General Electric Co., 522 U.S. 136, 118 S.Ct. 512 (1997).

**EXPERT TESTIMONY IS ONLY ADMISSIBLE IF IT COMPORTS WITH THE REQUIREMENTS OF FEDERAL RULE OF EVIDENCE 702 AND DAUBERT.**

FRE 702 states in its entirety:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In addition to the requirements set forth in FRE 702, the United States Supreme Court, in Daubert, established guidelines for determining whether expert testimony is admissible. In Daubert, the Court provided a non-exclusive list to consider in deciding whether expert testimony is sufficiently reliable to be admitted.

---

[1] See expert disclosure attached as Exhibit A.

> Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test. But some general observations are appropriate.... Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.... Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication. Additionally, in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation.... Finally, general acceptance can yet have a bearing on the inquiry. A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community.

Daubert, 509 U.S. at 593-94 (internal quotation marks and citations omitted). Daubert established a general "gatekeeping" function for trial courts. Id. at 597. See also, Federal Rule of Evidence 104 (preliminary questions concerning the qualification of a person to be a witness, or the admissibility of evidence, shall be determined by the court). This gatekeeping function has since been extended to apply to all expert testimony: specialized, technical, or scientific. See Kumho Tire v. Carmichael, 526 U.S. 137, 147-48, 119 S.Ct. 1167 (1999). The objective of the gatekeeping requirement is to ensure the reliability and relevance of expert testimony. Id. at 152. In addition to scrutinizing the methodology of an expert, trial courts must also scrutinize the conclusions of the expert. This is because

> ... conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected

3

>to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered.

Joiner v. General Electric Co., 522 U.S. 136, 146, 118 S.Ct. 512, 519 (1997).

These requirements have been held to apply to physicians rendering opinions in cases involving alleged occupationally related injuries. See, Stasior v. National Railroad Passenger Corporation, 19 F.Supp.2d 835 (N.D. Il. 1998)(carpal tunnel syndrome); Magdaleno v. Burlington Northern Railroad Co., 5 F.Supp.2d 899 (D.Co. 1998)(cumulative trauma disorder); Dukes v. Illinois Central Railroad Co., 934 F.Supp. 939 (N.D. Il. 1996)(carpal tunnel syndrome); Bennett et al. v. PRC Public Sector, Inc., et al., 931 F.Supp. 484 (S.D.Tx. 1996)(various repetitive motion injuries); Eggar v. Burlington Northern Railroad Co., No. CV 89-159-BLG-JFB, 1991 WL 315487 (D. Mont. 1991)(several alleged illnesses including hearing loss, attached as Exhibit B).

### DR. KIRCHNER'S OPINION IS INADMISSIBLE UNDER FRE 702 AND DAUBERT BECAUSE IT IS NOT BASED ON RELIABLE SCIENTIFIC METHODOLOGY.

Dr. Kirchner's opinion that the plaintiff's alleged hearing loss and tinnitus were caused by his exposure to noise at Metro-North is unreliable because he has no basis whatsoever to conclude that the plaintiff was exposed to noise in sufficient quantities or at decibel levels which could cause hearing loss and tinnitus. Dr. Kirchner's methodology appears to be an attempt at differential diagnosis.[2] However, this attempt at a differential diagnosis was insufficient for two reasons. First,

---

[2] A differential diagnosis is the process by which a physician excludes all possible causes of a physical condition until there is only one remaining possible cause. Hardyman v. Norfolk & Western Ry. Co., 243 F.3d 255 (6th Cir. 2001).

4

he failed to do the necessary investigation or analysis to establish the plaintiff's work at Metro-North as a possible cause of his symptoms. Second, he failed to adequately rule out other possible causes.

### Dr. Kirchner failed to do any investigation that would support including the plaintiff's exposure to noise at Metro-North as a possible cause of the alleged hearing loss and tinnitus.

Dr. Kirchner first evaluated the plaintiff on January 7, 2003, over eight months after the alleged occupational incident of May 1, 2002 and approximately six to eight months after the plaintiff claims he first had notice of his hearing loss and had "heard loud noise in his head." (Dr. Kirchner deposition transcript, p. 14, 20, attached as Exhibit C.) This evaluation was at the request of the plaintiff's attorney and solely for the purpose of this litigation. (Dr. Kirchner deposition transcript, p. 12-13, attached as Exhibit C.) Dr. Kirchner did no other investigative work in this matter. (Dr. Kirchner deposition transcript, p. 47-48, attached as Exhibit C.)

On January 7, 2003, after Dr. Kirchner's initial examination of the plaintiff, he diagnosed the plaintiff with "bilateral tinnitus following exposure to loud noise on May 1 of last year." (Dr. Kirchner report, dated January 7, 2003, attached as Exhibit D). The tinnitus was "probably related in part to his high frequency sensorineural hearing losses" and the "purteone patterns suggest that noise trauma is at least partly responsible." (Dr. Kirchner report, dated January 7, 2003, attached as Exhibit D). Thereafter, on April 20, 2005, Dr. Kirchner sent a letter to the plaintiff's attorney stating that "it is [his] opinion to a reasonable degree of medical certainty that occupational noise has contributed to his hearing loss." (Dr. Kirchner letter, attached as Exhibit E.) The sole basis for Dr.

5

Kirchner's opinion that noise at Metro-North caused the plaintiff's alleged hearing loss and tinnitus is what the plaintiff told him during his January 7, 2003 evaluation[3]. (Dr. Kirchner deposition transcript, p. 17-18, 49-50, attached as Exhibit C.) The plaintiff told Dr. Kirchner that, on May 1, 2002, "while working near a compressor, the motor was accidentally turned on and he was briefly exposed to its noise."(Dr. Kirchner's report, dated January 7, 2003, attached as Exhibit D.). He further told Dr. Kirchner that "he has been exposed to the noise of trains, horns, tampers, compressors, jackhammers, and other equipment." (Dr. Kirchner's report, dated January 7, 2003, attached as Exhibit D.)

Dr. Kirchner did not rely upon any scientific treatises, studies or review of the relevant literature on the issue of occupational noise-induced hearing loss and tinnitus. He never performed any testing of noise levels at the plaintiff's work-site or on the machines/equipment the plaintiff claims to have been exposed to, nor has he reviewed or relied upon any such testing. (Dr. Kirchner deposition transcript, p. 46-48, attached as Exhibit C.) He has no idea of what the noise levels were at the plaintiff's work sites. Id. Despite assuming that the plaintiff worked in a "noisy environment . . . several hours per day" and in "relative proximity" to noisy equipment, Dr. Kirchner simply has no basis in fact to conclude that the plaintiff was ever exposed to noise at Metro-North which was sufficient to cause hearing loss and tinnitus. Id. at 46-47.

---

[3] Dr. Kirchner examined the plaintiff in follow-up on November 23, 2004, but his opinion as to causation did not change. (Dr. Kirchner deposition transcript, p. 42, attached as Exhibit C).

At most, Dr. Kirchner understood the plaintiff's job to require him to be exposed to the noise of "trains, horns, tampers, compressors, jackhammers, and other equipment." (Dr. Kirchner report, dated January 7, 2003, attached as Exhibit D.) Despite an utter lack of familiarity with or measurement of the plaintiff's work requirements, Dr. Kirchner formed the opinion that the work at Metro-North caused the plaintiff's purported conditions.

The closest Dr. Kirchner comes to any basis for opining that noise at Metro-North caused the plaintiff's alleged hearing loss and tinnitus is his statement that "[t]he association between noise exposure and hearing loss has been extensively documented in the medical literature for over fifty years." (Dr. Kirchner letter, attached as Exhibit E.) He continues stating that the railroad had notice of this link, citing a presentation by Dr. Aram Glorig before the Medical and Surgical Officers of the Association of American Railroads. (Dr. Kirchner letter, attached as Exhibit E.) However, it is questionable whether Dr. Kirchner even relied upon this presentation in making his opinion.

Simply put, Dr. Kirchner has no basis for including noise at Metro-North as a possible cause of the plaintiff's alleged hearing loss and tinnitus.

### Dr. Kirchner failed to rule out other possible causes of the plaintiff's alleged hearing loss.

At the January 7, 2003 meeting, Dr. Kirchner discussed with the plaintiff his medical history. At no time did Dr. Kirchner review the plaintiff's medical records from Metro-North, or any of the plaintiff's treating physicians. In addition, Dr. Kirchner failed to fully ascertain what other activities the plaintiff engages in, past or present, that may have contributed to his hearing loss. (Dr. Kirchner

deposition transcript, p. 28, attached as Exhibit C.) Although he inquired about recreational shooting and loud music, he failed to inquire as to whether the plaintiff was exposed to firearms during his two-year service in the Army nor did he ask the plaintiff if he used home power tools or rode a motorcycle. (Dr. Kirchner deposition transcript, p. 25-26, 28, attached as Exhibit C.) No further attempt was made to ascertain a detailed medical history on the plaintiff or even to see if the plaintiff's recollection was accurate.

As described above and in Hardyman v. Norfolk & Western Railway Co., 243 F.3d 255, (6th Cir. 2001), differential diagnosis is a method by which a physician considers all possible causes for a given condition and then eliminates each potential cause until one remains. Courts, however, do not unilaterally admit expert testimony on the issue of causation simply because the plaintiff's proffered expert uses the magic words "differential diagnosis." The mere use of the term does not bring an expert's testimony within Daubert requirements.

Courts apply Daubert factors in their determination as to whether an expert is qualified and whether they performed a valid and reliable differential diagnosis. "To warrant admissibility, it is critical that an expert's analysis be reliable at every step." Amorgianos v. National Railroad Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). "When an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Id. citing Heller v. Shaw Industries, Inc., 167 F.3d 146, 153 (3d Cir. 1999). "The reliability analysis applies to all aspects of

an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." Id. citing Heller, 167 F.3d at 155.

The doctor in Hardyman used differential diagnosis to arrive at the opinion that the plaintiff's complaints of Carpal Tunnel Syndrome ("CTS") were caused by his work. The doctor in Hardyman was a specialist in occupational and environmental medicine. From what is contained in the Hardyman opinion, it is apparent that the doctor first investigated the tasks necessary to perform the plaintiff's job. The opinion states that the doctor was able to identify specific tasks that required intensive hand usage involving forceful use of the hands at extremes of posture. The doctor was able to state that the intensive hand use was required repeatedly during the day. Through his experience in occupational medicine, the doctor was able to determine that the plaintiff's work activities were significantly more hand intensive than other jobs. In sum, the doctor in Hardyman established that the plaintiff's work activities at the railroad were a potential cause of his CTS by investigating and analyzing the plaintiff's job tasks and responsibilities. The doctor in Hardyman then eliminated other possible causes for the plaintiff's CTS. He took an extensive history from the plaintiff which included a history of his non-occupational activities and medical conditions. Only after establishing that the plaintiff's work was a potential cause of his CTS, and eliminating all other possible causes, did the expert in Hardyman complete a valid differential diagnosis.

Unlike the doctor in Hardyman, Dr. Kirchner did nothing to establish that the plaintiff's work was a potential cause of his complaints. Dr. Kirchner did no investigation, measuring, quantification

of exposure to noise, or any other analysis of the plaintiff's work site. The only thing Dr. Kirchner knew about the plaintiff's work was that it involved some amount of exposure to the noise of trains, horns, tampers, compressors, jackhammers, and other equipment. Based on those facts, the only reasonable conclusion is that Dr. Kirchner assumed that the plaintiff had been exposed to sufficient decibels of noise for a sufficient period of time to cause his complaints. This is a far cry from the expert doctor in Hardyman determining that the total of the plaintiff's exposure to various risk factors for CTS amounted to a possible cause for his conditions. Indeed, what Dr. Kirchner did was akin to having assumed that the plaintiff was exposed to a sufficient amount of noise over a sufficient period of time at Metro-North to cause his complaints. Such assumptions have been rejected by many courts. Mancuso v. Consolidated Edison Company of N.Y., Inc., 967 F.Supp. 1437, 1450 (1997)(citing four cases and stating that such reasoning is circular and unacceptable.)

Also, unlike the doctor in Hardyman, Dr. Kirchner failed to eliminate other possible causes for the plaintiff's conditions. Dr. Kirchner failed to take an extensive history of the plaintiff's non-occupational activities, past or present. As discussed above, his only inquiry pertained to recreational shooting and exposure to loud music. (Dr. Kirchner deposition transcript, p. 25-26, 28, attached as Exhibit C.) However, the plaintiff testified at his deposition that, during his Army service, he was part of the light weapons infantry and was trained to use weapons such as .45-caliber pistols and M-16s. (DiLorenzo Deposition Transcript, p. 18-19, attached as Exhibit F). He further testified that he had been to concerts and used home power tools such as saws, drills, and

lawnmowers. (DiLorenzo Deposition Transcript, p. 80-81, attached as Exhibit F). It appears that Dr. Kirchner never considered these activities as possible causes.

Generally, under Daubert, "questions relating to the bases and sources of an expert's opinion affect the weight of the opinion, not the admissibility of the opinion." Eggar, 1991 WL 315487 at *3 citing Viterbo v. Dow Chem. Co., 826 F.2d 420 (5th Cir. 1987). "However, in certain cases the basis of the expert's opinion is of such 'little weight' that it would not assist a jury in reaching a sound verdict and should be excluded." Id. In Eggar, the court excluded the plaintiff's expert witnesses where, among other things, the experts failed to review the plaintiff's employment and medical records, despite the fact that such records had been collected by the parties. See id. at *9. The court noted that had the expert "reviewed the plaintiffs' outside records, he too would have found that other factors could be responsible for some of plaintiffs' conditions." Id. at *10. The court also found persuasive that the plaintiff's experts never considered or reviewed the measurements taken of the plaintiffs' work environment that allegedly caused their occupational injuries. "The doctors must do more than support their opinions with the fact that plaintiffs worked around various chemicals and now suffer from a variety of injuries, illnesses and conditions." Id. The court concluded that the plaintiff's experts opinions were "inadmissable because their opinions simply lack the foundation and reliability necessary to support expert testimony." Id. at *11.

Dr. Kirchner did not review any scientific literature supporting his conclusion, he did not perform any measurements or tests to ascertain whether the noise the plaintiff claims he is exposed

to at Metro-North exceeded OSHA levels and could actually cause the high frequency hearing loss, he did not visit the plaintiff at work and observe him performing his tasks in order to determine what noise he was actually exposed to, nor did he perform a thorough review of the plaintiff's medical history or question him about his non-occupational activities. However, based on one visit with the plaintiff,[4] he opined that the noise that the plaintiff is exposed to at Metro-North contributed to his hearing loss and tinnitus. Therefore, Dr. Kirchner's testimony should be excluded as insufficient under Daubert.

THE DEFENDANT,
METRO-NORTH RAILROAD COMPANY

By: _____
Charles A. Deluca, Esq., (CT 25301)
Ryan, Ryan, Johnson & Deluca, LLP
80 Fourth Street, P.O. Box 3057
Stamford, CT  06905
Phone No. 203-357-9200

---

[4] Dr. Kirchner's opinion did not change after Mr. DiLorenzo's second visit on November 23, 2004. (Dr. Kirchner deposition transcript, p. 42, attached as Exhibit C).

## CERTIFICATE OF SERVICE

      I hereby certify that on July 31, 2006, a copy of the foregoing Memorandum of Law in Support of Motion to Preclude Plaintiff's Expert was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

_____
Charles A. Deluca, Esq.

I:\Procases\205.171\MemoMotPreclude.wpd

205.171